Next case on today's calendar is the Confederated Tribes v. Norton. Thank you. Good morning, and may it please the Court, my name is John Carter. With me today is co-counsel Joseph Hovenkater. We represent the Salish Kootenai Tribes in this appeal. I'd like to take hopefully less than 15 minutes in the opening and reserve a few minutes for rebuttal if I could. This case involves the relationship between two Indian land acts with similar purposes but with different languages. I'd like to address first the distinctions between the two acts, then I'll touch on the district court ruling and the errors of law that we perceive, and finally explain to the Court why we believe that the Tribes' reading of the statute is purely reasonable within the meaning of this Court's and the basic golden provision from this Court was that when faced with two reasonable interpretations of the statute, this Court will choose that which the Tribes propose. As I say, it's the relationship between two federal statutes dealing with Indian land. Both statutes were enacted to try to correct, and in fact have corrected to a certain degree, the massive loss of Indian lands as a result of the allotment policies of the 1800s and the 1900s. Both acts, in one way or another, enable Tribes and or the Secretary of Interior to reacquire lands lost through the allotment process. But the acts employ a distinctly different language. One is an act of general application throughout Indian country, and the other is very specific to the Flathead Indian Reservation, and that's the ruling, the statute that we'd like this Court to evaluate the ruling below on. The statute of general application throughout Indian country is found at 25 U.S.C. 465. It was enacted in 1934 as part of the Indian Reorganization Act, the first major push of federal policy to overturn and to try to recoup lands lost through allotment, basically the beginning of the repudiation of the General Allotment Act. That act was very specific, and it's a one-section act, and what that act says, and it's at Appendix B to the brief, is that the Secretary is, quote, authorized in his discretion, unquote, to acquire lands on behalf of Indian tribes and people. The act then goes on to say the title shall be held in trust. So that statute is a very clearly discretionary authorization to the Secretary to acquire lands as he deems appropriate in his discretion. It's a self-implementing statute. The tribe is not granted or vested with any operative power in that statute. It is purely a discretionary decision of the Secretary of Interior. The Act of 1968, which has been briefed significantly in court, is an act specific to the Flathead Indian Reservation. It's a brief two-section act. In Section 1, the Secretary is, quote, authorized, unquote, upon request of the tribes to dispose of certain enumerated tracts of land. So the Secretary, without the request of the tribe, is not authorized to do any particular act, nor did Congress grant the Secretary with any express discretionary authority in Section 1 of the Act. Section 2 of the Act is much briefer, and in Section 2, the Secretary is, quote, authorized, unquote, again, upon the request of the tribes to acquire lands for the tribes and individual Indian people. And the second sentence of that act says that the Secretary shall take land in trust upon the request of the tribes. There's no discretionary language in the Flathead Act. It simply is a, quote, authorization, unquote, to dispose of land in Section 1, and an authorization, quote, unquote, to acquire land upon the request of the tribes in Section 2. And in Section 2, all lands acquired shall be held in trust. It's a pretty straightforward reading of the statute. There is no discretion in it. It's also important. Do you have any authority that suggests that the word authorized means must or means shall? I do, Your Honor, and I would go to the plain meaning of the word as defined in Black's Law Dictionary. In your brief, you relied on Black's Law Dictionary, 6th edition. I trust that's true. Did you determine whether there was a future edition of Black's Law Dictionary? I did not. I relied upon the dictionary at my desk. In fairness to you, before you continue your argument on that, and I'm sure the presiding judge will permit you to pick this up in your reply, you should take a look at the 7th edition, which we will pass to you. Apparently, I should. I didn't want to take you by surprise. Okay. In any event. That's something you will be allowed to take up on your reply because we're catching you by surprise. Okay. But as you can probably infer, the next edition uses a somewhat different definition, and we'll ask you to address that. Okay. And I'd like to address it right now, if I could, without having actually seen this. The point I intend to make here is the language, not necessarily the particularized definition in the abstract of a word or another word, but the fact that Congress chose very clearly different authorities in these two acts that serve basically the same function, to acquire land. Clearly, in the IRA, the early act, there was an authorization with discretion. There is no question that that's what Congress said. And clearly, in the Flathead Act, there was an authorization, period, without discretionary language written by Congress. It's important to note in that context that the Secretary of Interior was the primary author for Section 2 of the Flathead Act, and the legislative history bears that out clearly. The Secretary of Interior came up with that language with full knowledge of what Congress said in the 1934 IRA, Section 465. And in fact, the legislative history demonstrates that the Secretary had considered Section 465 while developing the language for the Flathead Act. And clearly, the Secretary, again, in the legislative history, was well aware of the tribe's very active land acquisition program and perceived the need to facilitate a different statutory framework to effectuate more fully the tribe's acquisition program. The Secretary and Congress both are deemed to be aware of the language of preexisting statutes. And in this case, the Secretary proposed language that deleted the discretionary function, and Congress adopted that language as proposed by the Secretary. The tribes read the Flathead Act as a mandate, as a non-discretionary mandate to take land in trust upon the request of the tribes. And the reason the tribes read it that way is because that's what we believe the statute says. Otherwise, it would render one or the other of those two acts essentially surplusage or superfluous. And the benefit to the tribe of a reading of plain language of the statute, distinguished from similar language, is that it would authorize or enable the Secretary to circumvent significant procedural and substantive steps in the process of taking land into trust, as contained in 25 CFR 151.10. That set of regulations generally deals with the transfer of land from fee to trust by the Secretary. There's a specific exception from a long checklist of items that the Secretary must go through, involving local government views on such things as taxation, jurisdiction, land use, et cetera. And the language in Section 151.10 of the CFR is the Secretary shall engage in all of these activities unless there is a legislative mandate to put land into trust. And that's what we believe the statute represents. That's what we believe the CFR has envisioned. The district court in the United States and the tribes all agree on one thing in this act, I think, and that is that the 1968 Flathead Act is clear, unambiguous, and specific to the Flathead Indian Reservation. I think that the United States and the tribes would also likely agree that 25 U.S.C. 465 is clear, unambiguous, and a statute of general application throughout Indian Country. And I think it's uncontestable that Congress employed markedly different language on those two acts that served similar, though not identical, purposes. Those distinctions in language were briefed to the district court. One statute says this. One statute says that. They serve the same function. The district court never addressed the distinctions in languages between 465 and the Flathead Act. I think that was an error because it ignored the basic canons of construction. But each statute contained the word authorized. Correct. In our construing language used in the statute, we have first, at least, to go to the dictionary. Yes. And putting that one aside, the dictionary seems to say that the word authorized has a non-mandatory aspect to it. Well, apparently the seventh does. The sixth did not, however. But, again. Well, I'm talking about Webster's and all the others that look to. In the definition provided by the United States, which I believe was a Webster's, there was no discussion of discretion. There was no explicit discussion of discretion in the word authorized in the United States definition either. In fact, there was no mention of the word discretion in the definition provided to the court by the United States. I don't happen to have the page side of their brief, but that was my reading of the definition provided by the United States. Couldn't we determine that the omission of the word discretionary in the later statute was a determination by Congress that it wasn't necessary to convey that it was non-mandatory when it was requested, particularly in view of the fact that the Secretary has a trustee-fiduciary relationship with Indian tribes to protect their interests? I think we could speculate, certainly, what the Secretary or Congress thought. Well, we have to speculate because they didn't explain why they eliminated that language. Well, there's a lot of reasons. There's no question about that. And I was trying to explain this case to my 16-year-old who just got a driver's license. And I said, well, you know, there's the basic rule that you stop at a red light. And if that's the only law you have, that's what you do. But some states, some jurisdictions have a right turn on red. And if you just read one and not the other, you might find yourself in trouble. And that's what the analogy I drew in trying to distinguish the two statutes. You have to read them together because they touch on the same subject. And that gets really to, I think, what the error of the Court was. Well, it's within the same statute. And I guess I'm struck by the use of the word shall in the following sentence. You could replace is authorized to with shall. And you clearly have a mandatory meaning. I think that it goes to what the word authorized means. Authorized is sort of the on-off switch. Without that statute, there would be no authority whatsoever. So Congress has to say to the Secretary, here is an issue we want you to work with. And you are now authorized to work with it. And here are the constraints we will put on your authorization. In the first instance, 465, the constraint was you may exercise your discretion. In the second instance, the constraint was you are authorized to do this. You have the on-off switch. But the constraints upon your application of that on-off switch depend upon the language of the statute. And the language of the statute says you are authorized upon request of the tribes. So without the word authorized, there is no forward motion on either statute. You need the authorization. It's authorizing Congress to declare war. It's authorizing the EPA to implement the Clean Water Act. Then the particularized contents of that statute explain how that authorization is to be implemented. I have a question that perhaps you can answer for me, mostly curiosity. Initially, it appeared to me in looking at the record that the tribes got what they wanted at the first step. They made the request, and they were told that that's what would happen. But they appealed it. It's not quite that linear, I'm afraid. Explain it to me. I was very puzzled. It looked like you won there, and you walked away with what you had. What we had asked initially was that the secretary or his designate, in this case the superintendent, take the land into trust under this Flathead statute as opposed to 465, because we believed it was a mandate as envisioned in the CFRs, because there was lack of any discretion. The secretary, in an undated opinion, agreed to take the land into trust, but then indicated that he was not taking it under trust in a mandate under the Flathead Act, but was, in fact, engaged in a trust transfer pursuant to the general authority of 465. From that point on, our question was not answered. Is the Flathead Act a mandate or not? And therefore, because the secretary's designate had not acted pursuant to the statutory authority that we had identified, we worked that case up. But since you got what you wanted initially, aren't we being asked to write an advisory opinion? I don't believe you are, Your Honor. I believe you're being asked to interpret the clearly distinct language of two statutes for the same purpose. One is a reservation-specific statute. One is a general application statute. Well, is it the end? I'm reading your rebuttal time, but since we're going to ask you to comment on the next edition, you'll still have your rebuttal time. The factual scenario here, I understood you to say, and from your brief as well, the difference between the two has to do with the ability of a local government to comment or intervene or somehow state its objection to the transfer. In the factual scenario, under the older provision, had that point yet been reached, was there still the possibility there was going to be objections so that the transfer to trust status would not be affected? Yes, there are two components to that. In the first instance, there have been objections to other earlier tracts of land by local governments. In this particular 40-acre tract, it has not yet gone into trust because the Secretary is now awaiting a ruling on the significance of these two statutes, read either separately or together. But there's a third component, too, and that is in this current administration, there has been a very strenuous move to amend the 25 CFR 151 Theta Trust Stat Regulatory Framework significantly and to make it much more difficult and more onerous for tribes and the Secretary to take both on-reservation and off-reservation land into trust. Those regulations have been out. They impose significantly greater timelines and burdens upon the tribe to prove things to its own trustee that pertain ultimately to the corpus of the trust, the desire of the tribes to repatriate their lands that they lost during the allotment process. It's a bit of a preemptive strike. If I understand correctly, if you win on the issue you're arguing to us, you've got a straight line to trust status, but if you go back the other way, the way that you did seem to win before, you still have some hurdles that have to be overcome. Significant hurdles, Your Honor. And the CFR is very clear on the types of hurdles that local government can impose. For example, under 25 CFR 151, absent a legislative mandate, the local government is entitled to several different shots or shots, bites at the apple on comment period as well as review period. Do you have standing to assert their rights to comment? I'm sorry? The local governments are not here as parties. Do you have standing to represent their interests? I wouldn't even attempt to try to represent their interests. Isn't that one of the complaints you have, that the Secretary failed to give them those? That is not my complaint, Your Honor, unless I'm misunderstanding your question. My suggestion in our reading is that they would be precluded as a matter of statute and regulation from providing this otherwise extensive avenue for objection to feud of trust. And I think there are an abundance of cases off the flathead that this Court itself, including several of the justices, or excuse me, Justice Alarcon, have ruled on, that demonstrate that local government on the flathead has been fairly strenuously opposed to tribal self-government and to tribal exercise of authority on the reservation. There's a case not in my brief. It's an 1886 U.S. Supreme Court case called the United States v. Kagama. And in Kagama, the Court, and this is almost a quote, the Court says, is it because of the local ill feelings in the states in which they live, the citizens of the state are often the tribe's most deadly enemies. I have the cite for that because it occurred to me. It's 118 U.S. 375 on page 384. And the actual quote is, because of the local ill feeling, the people of the states where they are found are often their deadliest enemies. And the manifestation in my lifetime working with the tribes is very clear. There was the Naaman decision in which the city of Polson argued that the flathead reservation was terminated. It no longer existed. That's not necessarily conducive to assisting a fee-to-trust transfer. And the various irrigation litigations, in-stream flow litigations in the 80s, one of which Justice Alarcon was on, the local irrigation districts, again, local governments, strenuously opposed the tribe's exercise of treaty and aboriginal rights, guaranteed by treaty under the U.S. Constitution. In the Middlemas litigation before this court in the 90s, again, the irrigation district sought to preclude completely tribal land use management within the reservation boundaries. And most recently, in a case called Montana versus EPA and the tribes, the state of Montana sought to shut down unsuccessfully. And in each instance, local government was unsuccessful, but it took recourse to this court or even above to get it. In the Montana case, the state of Montana sought to shut down the Salish Kootenai tribe's exercise of water quality authority explicitly contained in the Clean Water Act. So we have a history here of local government not being particularly hospitable to tribal desires, tribal interests, and tribal self-government. We believe that this statute provides a vehicle to deal with that and for the Secretary to deal with it. And it's almost ironic that the Secretary is ultimately the only one truly opposing this since if they went along with our reading, they'd have a whole lot less work to do. Thank you, and I appreciate you letting me know. Go ahead and take the volume with you. Take a look at that 7th edition, and you'll still have five minutes for vote. Thank you. May it please the Court, I'm the United States Attorney in the District of Montana. I represent the Secretary of the Interior, Ms. Norton, and on her behalf we ask that this Court affirm the judgment of the District Court. Before talking about the terms in the statute, I at least want to note that much of the discussion in the last five minutes appears to be seeking this Court to make a policy judgment or make a legislative judgment or to reflect on local government and tribal relationships in the State of Montana. And I think, according to Mr. Carter, here's something that in his view is not functional or appropriate. In the government's view, those things really don't have anything to do with the statutory interpretation that this Court has been asked to undertake and that the District Court has been asked to undertake. Let me raise it this way. Is there any question in your mind that there is a legitimate case or controversy here? We're not simply being asked for an advisory opinion. I do believe that there is an issue for this Court. I believe there's an issue properly before the Court, and that's whether the District Court, interpreting what the IBIA said, had a proper statutory interpretational law. Whatever happened before the IBIA's determination was not final agency action because exhaustion hadn't occurred. And so the matter before the Court today, I think, is ripe for decision. We raised the questions we did because at first blush, we looked at what happened, as Judge Alicorn indicated. It looks like, gee, you won. Why are you appealing? And the answer appears to be because the route from here on varies greatly depending upon whether they won the way they won or they win the way they'd rather win. Well, and that may be the case, Your Honor. We're going to lean on the language. And we're not trying to suggest that, in fact, we're trying to make a statutory interpretation decision based on which route we like. We just need to confirm that there's a real case there. And you don't dispute that there's a real case there. Government does not, has not, will not dispute that. But this notion that there's some sort of shift in administration policy, the IBIA decision is dated November 9, 2000, and all of these sort of equitable and rational policy arguments that have been advanced today, I might note, not having been briefed at all, don't have anything to do with the issue before the Court, which is the plain language of the Flathead Act. And as the questioning noted, the Congress says what it means and means what it says, and the Congress certainly could have said that upon request of the Flathead Tribe, the Confederated Salish Kootenai Tribes acting through their governing body, the Secretary of the Interior shall dispose of the following. It didn't say that. It is authorized. It could have said shall in Section 2 of the Act. It didn't say that. And so all of the equitable and policy arguments that are being made here really are an attempt to change the subject, which is what is it that Congress has allowed the Secretary of the Interior to do? And based upon the definition that we provided in our briefing, and frankly, the plain understanding of what the words is authorized mean. Now, when this Court considers what the Sentencing Commission has done, and district courts are authorized to do certain things based upon provisions in the guidelines, that doesn't mean that a district judge shall do something, must do something. It means that there's discretion for the district court to act. And that's what that first clause, first sentence in both Section 2 and Section 1 allow. It's not mandatory language, and the district court got it right. And as a result, the district court should be affirmed. The language that the government cited in its brief talks about how the language requires the following. It empowers. It gives a right or authority to act. It permits a thing to be done in the future. And that is not mandatory language. So they're just the plain language of the statute doesn't allow the relief that the tribes have sought. Now, one of the things that is prominent in the briefing, and Mr. Carter noted that the tribes were disappointed or frustrated that the district court had not addressed what they perceived to be a significant deviation in the language in the set forth in 25 U.S.C. 465 as opposed to the Flathead Act. And he has continued to key on the fact that in the prior statute, there's language that says in his discretion. And somehow there's a suggestion that because the Congress didn't include that prepositional phrase in the subsequent act, that that converts it into mandatory language. Again, based upon the plain understanding, plain meaning of the term is authorized. The fact that the Congress didn't include that prepositional phrase does not make this mandatory. Moreover, there seems to be a suggestion in the briefing, both in the district court and in this court, that there has to be some mandatory significance to the first two sentences in Section 1 and Section 2, because if there wasn't, there wouldn't be any useful purpose for those statutes to the second statute to have been enacted. And the government wishes to draw this Court's attention to the fact that that subsequent act did two things for the Secretary of Interior in terms of authority that she did not have before the enactment of the subsequent act. First, the act changed authority only with respect to disposal of trust land, because that first statute didn't allow tribes to sell or mortgage in order to get capital to purchase more suitable or useful land. And it appears from the legislative history that the senatorial delegation from Montana was very concerned about the to allow the Secretary of Interior, based upon a request from the tribes, gave her the authority to do this, to sell those properties, and the tribe did not have that authority based upon the plain language of 25 U.S.C. 465. And finally, the subsequent statute also allowed the sale of acquired land to tribal members, and that was not something that, in the view of the government, was a part of that initial statute, and therefore required or didn't require, but certainly provided some sort of compelling basis for the Congress to enact the subsequent statute. So there is significant meaning and purpose to the subsequent statute that allows it to exist and doesn't somehow suggest that there wouldn't have been a rational basis for the Congress to enact it, given the existence of 25 U.S.C. 465. In the government's view, the matter has been exhaustively briefed, and unless the Court has more questions for me at this time, I'd be happy to rest. Thank you. Thank you. Thank you again. I see that there was only a minor change, actually, in the 6th to the 7th edition. The basic language is the same. Authorized. Authorize means to give legal authority, to empower, to formally approve, to sanction. The 6th edition also had this clause in it that says, authorize is a mandatory concept. This doesn't, however, in the 7th edition, suggest that you have other language that you rely on. Yes, I did. But I think the explanation goes the same under either the 6th or the 7th edition because there is no statement in the 7th edition that says authorize is discretionary. It says it is the power to give authority. It's the on-off switch, as I'd previously discussed. Here's what my real problem with the district court decision is. It's a couple, actually. The district court, let's go back to the 6th edition because I want to make sure we're talking about the same thing. As I read the 6th edition, it said that authorize can have a, quote, mandatory effect or meaning implying a discretion to act, direction to act. Direction. Direction, excuse me, direction to act. Yeah. And that particular mandatory language portion has been deleted from the 7th edition. And there was no language of discretion in either the 6th or the 7th. Basically, if you delete the mandatory language from the 6th, you have the same definition that you have in the 7th. It's the power, it's the authorization to do something. The question then is what conditions does Congress put on that power? And that's our point. But there's a couple just fundamental flaws with the district court decision. And one of them is that the court twice finds that the Flathead Act expressly contains discretionary language. The court makes that finding on both page ER records 68 and 7. 68 and 7. The court says explicitly contains discretionary language. And that it simply doesn't. That's just factually inaccurate. The next part of it that's really confusing to me is that the court seems to treat the concept of authorization differently between Sections 1 and Section 2. For example, in the opinion of ER 68, the court finds that the plain meaning of Section 1, which is the act that authorizes the disposition, is mandatory. That's on ER 68. A plain reading of the act, and this is not a direct quote, a plain this is, a plain reading of the statute demonstrates that acquisitions of land under the act are mandatory only when the lands acquired have been purchased for proceeds of sales of lands enumerated in Section 1 of the act. Well, that's not what the statute says. It uses the same language exactly in each section. So how it can be mandatory in Section 1 and discretionary in Section 2, and it's exactly the same word. I think what that refers to is the paragraph of Section 1 after the enumeration of the various plots of real estate. Yes. And that uses the word shall. Yes. And that proceeds shall be used. And that is mandatory without question. Agreed. So I'm not sure what's wrong about what the district court has said there. Shall appears in both sections. Authorized appears in both sections. The statutory language is the same in each section. And how can it be discretionary in one and mandatory in the other? I simply don't understand. One uses the word shall, and the other uses the word is authorized. I mean, the notion that the shall part relates to using the proceeds, if there had been a sale of land in Section 1, those proceeds shall be used to acquire. Yes. And what the district court says is that acquisitions of land under the Act are mandatory only when the lands acquired have been purchased with the proceeds of sales of lands enumerated in Section 1. That's a statement that refers to this shall sentence, not to the is authorized sentence in Section 1. Well, again, I look at what Section 1 does, and it says that those lands shall be acquired in accordance with the provisions of Section 2. Title shall be dealt with in accordance with the provisions of Section 2. Section 2 is the only portion of the statute that actually addresses title and that applies by reference in Section 1 to Section 1 as well as to Section 2. So you have the same operative language in each section of the statute. Anyway, that's our reading of it. In conclusion, I guess I would like to, one, thank the Court for allowing me to burn up additional time, and two, indicate that Congress clearly knows how to write a statute, and it has used different language in these two different statutes, and that one is a general statute of general application, the other is a particularized statute to deal with the unique situation on the Flathead Reservation. And under the Gobin rationale of this Court, the tribe's analysis is that authorized means authorized, not authorized with discretion. That's certainly a reasonable reading of the statutory language. To read discretion into it, you have to impute something that Congress did not write in that statute. And, therefore, we perceive that the tribe's interpretation of the statute is certainly reasonable within the Gobin rationale, and, therefore, under your opinion in that decision, reasonable interpretations, if there are two reasonable interpretations of a statute, the Court will side with that interpretation provided by the tribes. Thank you very much, Your Honors. Well, thanks to both counsel. The case is submitted.
judges: Browning, Alarcon, Clifton